**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

**ARCHER WESTERN CONTRACTORS, LLC**          **CIVIL ACTION**

**VERSUS**                                                    **NO. 22-5323**

**THE MCDONNEL GROUP, LLC**                   **SECTION: D (5)**

## ORDER AND REASONS

Before the Court is a Motion for Partial Summary Judgment filed by the Defendant, The McDonnel Group, LLC.[1] The Plaintiff, Archer Western Contractors, LLC, opposes the Motion.[2] The Defendant filed a Reply in support of its Motion.[3] After careful consideration of the parties' memoranda, the record, and the applicable law, the Court **GRANTS** the Motion.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

This Court has previously detailed the factual background of the events germane to this lawsuit in the Court's prior Orders denying the Defendant's motions to dismiss.[4] Accordingly, the Court summarizes the relevant background only as it relates to the instant Motion for Partial Summary Judgment.[5]

---

[1] R. Doc. 55.
[2] R. Doc. 56.
[3] R. Doc. 61.
[4] *See* R. Docs. 50 & 67.
[5] For the purposes of the factual background, the Court considers TMG's Statement of Material Facts Which Present No Genuine Issue, R. Doc. 55-5, and AWC's Statement of Material Facts in Opposition to Defendant's Motion for Partial Summary Judgment, R. Doc. 56-1. TMG's Undisputed Facts that are undisputed by AWC are Numbers 1–9, 11. AWC partially disputes Numbers 10, 12–13 as to the legal conclusions.

This case concerns the alleged failure of Defendant The McDonnel Group, LLC ("TMG") to abide by certain agreements and commitments made in a Joint Venture Agreement with Plaintiff Archer Western Contractors, LLC ("AWC").  On May 2, 2011, TMG and AWC entered into a Joint Venture Agreement (the "Agreement") establishing the McDonnel Group, LLC/Archer Western Contractors, Ltd. Joint Venture (the "Joint Venture") for the purpose of submitting a bid and obtaining a contract for the construction of the Orleans Parish Sheriff's Office Inmate Processing Center/Templeman III & IV Replacement Administration building (the "Project") from the Law Enforcement Division of Orleans Parish, State of Louisiana (the "Owner").[6]  According to the terms of the Agreement, AWC and TMG are to share any profits and any losses accruing to the Joint Venture from performance of the Contract in accordance with their proportional interest in the Joint Venture; at the outset, AWC held a seventy percent share of the Joint Venture while TMG held the other thirty percent.[7]  Not long after forming the Joint Venture, on July 28, 2011, the Joint Venture entered into a contract with the Owner to construct the Project (the "Contract").[8]

"To facilitate the handing of any and all matters and questions in connection with performance of the Contract," the Agreement establishes an Executive Committee comprised of one representative and one alternate from each party.[9]  AWC largely controls the Executive Committee; the representatives of each party on the

---

[6] R. Doc. 55-5 at ¶¶ 1–2.
[7] R. Doc. 55-2 at p. 3 (Article 3(a)).
[8] R. Doc. 55-5 at ¶ 2.
[9] R. Doc. 55-2 at p. 4 (Article 4(a)).

Executive Committee have "a vote equal to his party's Proportionate Share."[10] Although certain Executive Committee decisions may be determined by majority vote, Executive Committee decisions must be unanimous where "any other provision of th[e] Agreement specifies unanimous approval of the parties."[11]  In the event that the Executive Committee members "fail to reach a unanimous decision, the matter in question may at the election of any party hereto be referred to the Senior Officer of each of the parties for resolution pursuant to Article 17."[12]  The Agreement also designates AWC as the Managing Party of the Joint Venture, giving AWC "charge and supervision over the timely and satisfactory performance of the Contract, subject, however, to the superior authority and control of the Executive Committee."[13]

To effectively perform the Contract, the Agreement requires TMG and AWC to make certain working capital contributions "in accordance with their Proportionate Shares."[14]  Per the Agreement, the Managing Party, *i.e.*, AWC, determines the need for capital contributions and the date on which the capital is to be furnished to the Joint Venture.[15]  Specifically, Article 7(a) provides: "[t]he need for working capital and the dates on which it is to be furnished shall be determined by the Managing Party and upon unanimous approval of the Executive Committee, each such determination shall be binding and conclusive on the parties."[16]  Relatedly, Article 4(f)(iii) of the Agreement provides that: "The Executive Committee shall have power

---

[10] *Id.* at p. 5 (Article 4(c)).
[11] *Id.* at p. 5 (Article 4(c)).
[12] *Id.* at p. 6 (Article 4(c)).
[13] *Id.* at p. 7 (Article 5(a)).
[14] *Id.* at p. 9 (Article 7(a)).
[15] *Id.*
[16] *Id.*

and authority to review for approval the Managing Party's recommendations in such matters as the overall plan for execution of the Work, determination of the amount of working capital required, [and] the timing of calls for working capital contributions."[17]

The Agreement also provides for specific remedies should a party fail to provide working capital. Article 7(e) of the Agreement states:

> Should any party (the "Defaulting Party") be unable or fail or neglect to contribute its Proportionate Share of the working capital within 7 calendar days after the date set for the contribution thereof by the Managing Party, the other Party (the "Non-Defaulting Party") may, at their option, pay the share of the Defaulting Party (the "Defaulting Party's Contribution"). If the Non-Defaulting Party pays all or part of the Defaulting Party's Contribution, such payments shall be deemed to be demand loans made by the Non-Defaulting Party to the Defaulting Party. Such loans shall be immediately repayable by the Defaulting Party without notice and shall bear interest at a rate per annum equal to 3% above the Prime Lending Rate, determined on a day to day basis.[18]

In the event of a default by one party, the voting strength of the Executive Committee representatives of the non-defaulting party is "increased to the proportion that its actual contributions to working capital (including loans therefore to the Defaulting Party) bear to the total contribution made to working capital by the parties," while the strength of the defaulting party is decreased proportionally.[19] Further, Article 15(e) of the Agreement specifies that the defaulting party must pay any legal

---

[17] *Id*. at p. 6 (Article 4(f)).
[18] *Id*. at p. 9 (Article 7(e)).
[19] *Id*. at p. 10 (Article 7(f)(i)).

expenses required by the non-defaulting party "to protect their interests or defend any action arising out of the Defaulting Party's breach."[20]

Several disputes arose during the performance of the contract between the Joint Venture and the Owner.[21]  Although those disputes and accompanying litigation are not directly relevant here, the parties agree that by May 2015, the Owner's "wrongful failure to properly compensate the [Joint Venture] created critical cash flow issues for the [Joint Venture]."[22]  These cash flow problems required the Joint Venture to obtain additional capital contributions from its constituent parties—AWC and TMG—in order to continue its work on the Project and to compensate subcontractors.[23]

It is at this point, May 2015, that the disputes within the Joint Venture relevant to the instant litigation started to take hold.  The parties agree that beginning in mid-2015 and continuing until mid-2019, AWC, as Managing Party, made numerous determinations for working capital contributions from the parties and that TMG failed to make any such contributions.[24]  AWC paid TMG's share of capital contributions pursuant to Article 7(e) and deemed such payments to be demand loans made by AWC to TMG.[25]  It is undisputed that the Executive Committee did not vote on or approve any of AWC's working capital determinations

---

[20] *Id.* at p. 17 (Article 15(e)).
[21] R. Doc. 55-5 at ¶ 3.
[22] *Id.* at ¶ 8.
[23] *Id.* at ¶ 9.
[24] *See* R. Doc. 55-1 at p. 3; R. Doc. 55-3, *Deposition of Allan McDonnel*, at p. 2; R. Doc. 55-4 at pp. 3–4; R. Doc. 56-2, *Affidavit of Michael Whelan*, at ¶ 16.
[25] *See* R. Doc. 56-2, *Affidavit of Michael Whelan*, at ¶ 20.

during the relevant time period either because TMG voted against the determinations or because TMG failed to attend the Executive Committee meetings.[26]

AWC filed the present lawsuit against TMG on December 16, 2022, alleging Breach of Contract in Count I, Breach of Fiduciary Duty in Count II, and Enrichment Without Cause in Count III.[27]  Of relevance to the instant Motion, AWC alleges in Count I that TMG breached the Joint Venture Agreement by (1) failing to provide necessary working capital contributions to the Joint Venture; (2) failing to pay back $6,096,407.00 in loans to AWC, representing capital contributions which AWC paid due to TMG's alleged default plus applicable interest; and (3) failing to act in good faith in its participation in the Joint Venture Executive Committee by refusing to approve necessary requests for capital contributions and by refusing to attend and participate in Executive Committee meetings.[28]  As to Count I, AWC seeks damages, interest, attorney's fees, and costs, including the repayment of the full amount of the monies deemed to be loaned by AWC to TMG.[29]

As for Count II, Breach of Fiduciary Duty, AWC similarly alleges that TMG breached its fiduciary duty as its sole partner in the Joint Venture to AWC by (1) failing to act in good faith in its participation in the Executive Committee; (2) failing

---

[26] *See* R. Doc. 55-4 at p. 4 ("TMG's representative wrongfully refused to vote in favor of needed working capital calls at the Executive Committee level."); R. Doc. 55-5 at ¶ 13; R. Doc. R. Doc. 55-3, *Deposition of Allan McDonnel*, at p. 2.

[27] R. Doc. 1. The Court ordered AWC to file an Amended Complaint properly alleging the citizenship information of the parties to ensure that the Court has subject-matter jurisdiction over this action. R. Doc. 4.  AWC subsequently filed an Amended Complaint.  R. Doc. 6.  Several months later, AWC filed a Second Amended Complaint clarifying certain factual allegations made in its Amended Complaint. R. Doc. 42.  The Court only considers the Second Amended Complaint here.

[28] R. Doc. 42 at ¶¶ 100–16.

[29] *Id.* at ¶¶ 117–18.

to make the required working capital contributions to the Joint Venture; and (3) failing to repay the loan amounts to AWC created via AWC's funding of TMG's share of capital contributions.[30]  AWC seeks damages interest, attorney's fees, and costs for Count II as well.[31]

 In the instant Motion, TMG moves to dismiss AWC's claims to recover the several million dollars' worth of "loans" which allegedly originated when TMG failed to make required capital contribution payments to the Joint Venture and AWC paid those contributions on TMG's behalf.[32]  TMG contends that AWC's capital contribution determinations were never binding upon TMG because they were never properly authorized and approved by the Joint Venture Executive Committee. Accordingly, TMG argues that it cannot be liable to AWC for payment on the unapproved capital contributions because the loans never properly came into being in the first place.  TMG therefore moves to dismiss any and all of AWC's claims as they relate to TMG's alleged failure to pay capital contributions.

AWC filed a response in opposition to the Motion in which AWC primarily argues that the capital contributions became binding upon TMG once AWC, the Managing Party, made the relevant determination that a need for capital contributions existed.[33]  AWC claims that TMG's interpretation of the Agreement distorts the intent of the parties and absurdly allows for the minority party, TMG, to obstruct the functioning of the Joint Venture.  AWC further faults TMG for refusing

---

[30] *Id.* at ¶¶ 119–29.
[31] *Id.* at ¶¶ 130–31.
[32] R. Doc. 55.
[33] R. Doc. 56.

to participate in the Executive Committee meetings and for dodging its responsibility to pay the working capital.

TMG filed a reply in support of its Motion, contending that the intent of the parties was to require unanimous Executive Committee approval of the Managing Party's determinations for the determinations to bind the parties and disputing AWC's arguments concerning Article 7(e).[34]  TMG also addresses and distinguishes several cases cited by AWC in its response in opposition to the Motion.

## II.   LEGAL STANDARD

Summary judgment is appropriate under Federal Rule of Civil Procedure 56 "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[35]  A dispute is "genuine" if it is "real and substantial, as opposed to merely formal, pretended, or a sham."[36]  Further, a fact is "material" if it "might affect the outcome of the suit under the governing law."[37] When assessing whether a genuine dispute regarding any material fact exists, the Court considers "all of the evidence in the record but refrain[s] from making credibility determinations or weighing the evidence."[38]   While all reasonable inferences must be drawn in favor of the nonmoving party, a party cannot defeat

---

[34] R. Doc. 61.  TMG attached several exhibits to their Reply purporting to depict the parties' pre-Agreement negotiations regarding several provisions in the Agreement.  The Court does not find that such extrinsic evidence as to the parties' intent is appropriate to consider here.

[35] Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).

[36] *Bazan ex rel. Bazan v. Hidalgo Cnty.*, 246 F.3d 481, 489 (5th Cir. 2001) (citing *Wilkinson v. Powell*, 149 F.2d 335, 337 (5th Cir. 1945)).

[37] *Liberty Lobby*, 477 U.S. at 248.

[38] *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398–99 (5th Cir. 2008) (citations omitted).

summary judgment with conclusory allegations, unsubstantiated assertions or "only a scintilla of evidence."[39]  Instead, summary judgment is appropriate if a reasonable jury could not return a verdict for the nonmoving party.[40]

If the dispositive issue is one on which the moving party will bear the burden of proof at trial, the moving party "must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial."[41]  The non-moving party can then defeat summary judgment by either submitting evidence sufficient to demonstrate the existence of a genuine dispute of material fact or by "showing that the moving party's evidence is so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of the moving party."[42]  If, however, the nonmoving party will bear the burden of proof at trial on the dispositive issue, the moving party may satisfy its burden by merely pointing out that the evidence in the record is insufficient with respect to an essential element of the nonmoving party's claim.[43]  The burden then shifts to the nonmoving party who must go beyond the pleadings and, "by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"[44]

---

[39] *Id.* (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)) (internal quotation marks omitted).

[40] *Id.* at 399 (citing *Liberty Lobby*, 477 U.S. at 248).

[41] *International Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1264–65 (5th Cir. 1991).

[42] *Id.* at 1265.

[43] *See Celotex*, 477 U.S. at 322–23.

[44] *Id.* at 324 (quoting Fed. R. Civ. P. 56(e)).

## III.   ANALYSIS

The narrow issue before the Court is one of contract interpretation: does the Agreement require Executive Committee approval of the Managing Party's determination of the need for capital contributions in order to bind the Joint Venture members or does the Managing Party's determination alone bind the members? Because the Court finds that the plain language of the Agreement supports the former reading and not the latter, the Court grants the Defendant's Motion.

Under Louisiana law, contract interpretation "is the determination of the common intent of the parties."[45]  "When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent."[46]  Further, "[t]he words of a contract must be given their generally prevailing meaning."[47]  A court should not construe a contractual term or phrase in isolation.  Rather, "[e]ach provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole."[48]  With these principles in mind, the Court considers the language of the Agreement.

The Joint Venture's need for working capital to perform the Contract necessitates that TMG and AWC "shall" make certain capital contributions "when and as required for the performance of the Contract . . . in accordance with their

---

[45] La. C.C. art. 2045.
[46] La. C.C. art. 2046.
[47] La. C.C. art. 2047.
[48] La. C.C. art. 2050.

Proportionate Shares."[49]  That provision is not self-executing; rather, per Article 7(a) of the Agreement, "[t]he need for working capital and the dates on which it is to be furnished shall be determined by the Managing Party," *i.e.*, AWC.[50]   Crucially, however, Article 7(a) continues that "upon unanimous approval of the Executive Committee, each such determination [by the Managing Party] *shall be binding and conclusive on the parties*."[51]  As a whole, the relevant language from Article 7(a) reads: "[t]he need for working capital and the dates on which it is to be furnished shall be determined by the Managing Party and upon unanimous approval of the Executive Committee, each such determination shall be binding and conclusive on the parties."[52]  Thus, the determination of when working capital is "required for the performance of the Contract" involves an initial determination by the Managing Party and then a subsequent approval by the Executive Committee.

TMG reads Article 7(a) as requiring the Executive Committee's unanimous approval of any capital determination by the Managing Party to make such determination binding upon the parties.  As it is undisputed no such unanimous approval ever occurred, TMG contends that it was never obligated to make the working capital contributions which AWC claims TMG defaulted on and now seeks to recover as loans.  In contrast, AWC interprets Article 7(a) as mandating that the parties "shall" furnish capital contributions to the Joint Venture whenever the Managing Party determines the need and date of such contributions, and that

---

[49] R. Doc. 55-2 at p. 9 (Article 7(a)).
[50] *Id.*
[51] *Id.* (emphasis added).
[52] *Id.*

Executive Committee "pre-approval" is not required.  In other words, the Managing Party's determination itself binds the parties.  AWC also contends that TMG's proffered reading renders Article 7(e) meaningless because there would be no need for the remedies set forth in Article 7(e) if the Executive Committee had to unanimously approve the capital contribution determinations before Article 7(e) could take effect.  AWC further argues that a reading of the language which mandates post-approval by the Executive Committee would lead to an absurd result that "a 30% partner [TMG] can unilaterally plunge the Joint Venture into insolvency and force the Joint Venture to abandon its obligations on a major public infrastructure project without repercussions."[53]

A close reading of Article 7(a)'s language yields only one plausible interpretation.  First, the Managing Party determines the need for working capital and the date on which it is to be provided.  Second, if the Executive Committee unanimously approves that determination, then the Managing Party's determination conclusively binds the parties.[54]  In short, the Managing Party determines, and the Executive Committee approves (or disapproves) of that determination.  Because the clear and explicit language of the Agreement provides that the Managing Party's determination of the need for working capital becomes "binding and conclusive on the parties" "upon unanimous approval of the Executive Committee," it follows that the

---

[53] R. Doc. 56 at p. 1.
[54] Unanimous approval really does mean unanimous approval as well.  Although some Executive Committee decisions may be made by majority vote—in which case only AWC would have to vote in favor—the Agreement provides that unanimous approval is required where "any other provision of this Agreement specifies unanimous approval of the parties."  *See id.* at p. 5 (Article 4(c)(vii)).  Article 7(a) is one such part of the Agreement which specifies that unanimous approval is required.  *See id.* at p. 9 (Article 7(a)) ("[U]pon unanimous approval of the Executive Committee.").

Managing Party's determination itself, absent Executive Committee approval, does not bind the parties.[55]  To find otherwise would ignore the plain language of the Agreement and reduce the Executive Committee's function to binding the parties to an already binding determination, a wholly illogical and perfunctory exercise.

Article 7(a)'s provision that the Managing Party's giving of less than thirty days' notice prior to the date of payment of the capital contributions "shall not affect the obligation of the parties to make the contribution on the date set for payment" does not undermine the Court's conclusion.[56]  That provision necessarily assumes that the determinations are otherwise obligatory and binding because of Executive Committee approval and simply provides that shorter time frames do not frustrate a binding capital contribution request.[57]  It does not support AWC's claim that the Managing Party's determinations themselves impose obligations.  In sum, the Court finds that the language of Article 7(a) unambiguously demonstrates that a party is not bound by the Managing Party's determination, and thus subject to the default provisions of Article 7(e), unless the Executive Committee unanimously approves the determination.

---

[55] *Id.*

[56] *Id.*

[57] AWC contends that by allowing for a window of under thirty days from determination to payment, Article 7(a) demonstrates that unanimous Executive Committee approval is not required because the Executive Committee cannot be expected to approve determinations on such expedited basis.  *See* R. Doc. 56 at p. 6.  Not only does this provision fail to contradict the clear language of Article 7(a)—and as addressed below, Article 4(f)(iii)—the provisions are not in tension with one another.  The Executive Committee can meet whenever so requested by any member subject to a ten days' notice or "such lesser period upon which the members of the Executive Committee may agree." R. Doc. 55-2 at p. 5 (Article 4(b)).  That is, the Executive Committee may effectively meet whenever its members want.  The Court finds no merit to AWC's arguments that the Executive Committee cannot meet in a timely manner to approve working capital determinations with short notice.

Other provisions in the Agreement support TMG's, and ultimately the Court's, interpretation of Article 7(a).  By way of example, the plain language in Article 4(f)(iii) provides that "[t]he Executive Committee shall have power and authority to *review for approval* the Managing Party's recommendations in such matters as the overall plan for execution of the Work, *determination of the amount of working capital required*, [and] *the timing of calls for working capital contributions*."[58]  The Court finds this language to be clear and unambiguous.  Read in conjunction with Article 7(a), this provision demonstrates that it is the Executive Committee which approves the Managing Party's "recommendations" as to the "determination of the amount of working capital required" and the timing of when the working capital shall be provided.  Referring to the Managing Party's determination of the need for working capital as a mere "recommendation" which the Executive Committee has the ultimate power to review and approve underscores the non-binding nature of the Managing Party's determinations.   AWC's view that the Managing Party's determination alone—a "recommendation" per the language of Article 4(f)(iii)—binds the parties turns the language of the Agreement on its head.[59]  While AWC contends that TMG's interpretation leads to absurd results, the Court finds to the contrary.  The Court finds that Article 4(f)(iii) supports TMG's construction of the Agreement.

---

[58] R. Doc. 55-2 at p. 6 (Article 4(f)(iii)) (emphasis added).

[59] AWC claims that because no clause in the Agreement "states that absent unanimity, the JV partners are not obligated to make a capital contribution[,]" it follows that unanimity is not required for the capital determinations to be obligatory.  R. Doc. 56 at p. 6.  The Agreement is clear, however, that if the determination is unanimously approved then it is binding.  That the Agreement does not include the inverse of that statement is of no import; the intent of the parties is clear.

AWC ignores Article 4(f)(iii) entirely and even claims, incorrectly, that the only reference to "capital" in Article 4 is Article 4(c)(v), an unrelated provision.[60]   AWC also argues that "[n]othing in the provision dictates that the Executive Committee must review the Managing Party's determination and unanimously approve a working capital contribution before the JV partners must make their payments."[61] AWC's assertion that "the only reference to 'capital' at all in Article 4 is Article 4(c)(v)" is not accurate.[62]   As noted above, Article 4(f)(iii) explicitly provides that the Executive Committee "review[s] for approval" the Managing Party's "recommendations" as to determinations of working capital.[63]  Although AWC claims that the Agreement lacks any "specific, plain language" requiring the Executive Committee's approval before the parties are obligated to make capital contributions, the plain text of Article 4(f)(iii) belies AWC's argument.  AWC's exclusive focus on Article 7 and failure to read the Agreement as a whole undermines its arguments.[64]

AWC's interpretation of the Agreement renders obsolete the Executive Committee's stated role in reviewing and approving the Managing Party's determination of the need for working capital.  In AWC's view, one of two possibilities may occur.  First, the Executive Committee can unanimously approve the working capital contribution determination, at which point "the issue is settled and binding."[65]

---

[60] R. Doc. 56 at p. 15.

[61] *Id.*; *see also id.* at p. 9 ("A review of the JVA as a whole confirms that unanimous pre-approval by the Executive Committee is not required to enforce the Managing Party's directive to contribute working capital.").

[62] R. Doc. 56 at p. 15.

[63] R. Doc. 55-2 at p. 6 (Article 4(f)(iii)).

[64] *See* La. C.C. art. 2050 ("Each provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole.").

[65] R. Doc. 56 at p. 7.

According to AWC, the parties would then be unable to avail themselves of Article 17's dispute resolution process and could not later challenge the determinations.[66] Second, if the Executive Committee does *not* approve the Managing Party's determinations, AWC explains, then one of the parties "can challenge the issue through the Disputes provision in Article 17."[67] Nevertheless, AWC maintains that the Managing Party's determinations themselves obligate the parties to contribute working capital on the date requested regardless of how the Executive Committee votes. Thus, in the former scenario, the Executive Committee would be voting to make an already binding determination "binding and conclusive," and in the latter scenario, the Executive Committee's lack of approval would have no effect on the parties' obligations. To state the proposition is to refute it. Of what purpose is the Executive Committee's approval if the Managing Party's determination itself already binds the parties? AWC provides no clear answer.

AWC's chief flaw is assuming that regardless of which two outcomes happens the Managing Party's determinations are nevertheless binding upon the parties. This "heads-I-win, tails-you-lose" reading contradicts the clear contractual language. AWC incorrectly argues that should the Executive Committee fail to unanimously approve the capital contributions and one of the parties decides to invoke the dispute resolution process in Article 17, the contributions are still nonetheless due and binding. Thus, under AWC's view, regardless of whether the Executive Committee approves or disapproves the capital contributions, they are still immediately binding

---

[66] *Id.*
[67] *Id.*

upon the parties upon the determination of the Managing Party.  This reduces the Executive Committee to little more than a debating society with no power one way or the other to bind the parties.  Again, that contradicts the express language of Article 7(a) which states that the Managing Party's determinations are binding "upon unanimous approval of the Executive Committee," as well as Article 4(f)(iii)'s grant of power to the Executive Committee to "review for approval the Managing Party's recommendations in such matters as the . . . determination of the amount of working capital required."[68]  Moreover, AWC's reading empowers the Managing Party at the expense of the Executive Committee in contradiction of the Agreement's recognition of the "superior authority and control of the Executive Committee."[69]

None of AWC's various counterarguments are persuasive.  AWC resists TMG's reading of the Agreement by principally relying on the first sentence in Article 7(a) which states: "All working capital, when and as required for the performance of the Contract, *shall* be furnished by the parties in accordance with their Proportionate Shares."[70]  AWC syllogistically argues that because working capital "shall be furnished" when "required for the performance of the Contract," and because AWC, as the Managing Party, determines the need for working capital, it follows that TMG is obligated to furnish working capital whenever AWC so determines.  Such a conclusion rests on incomplete premises and ignores the clear and explicit language regarding Executive Committee approval altogether.  True, the Agreement provides

---

[68] R. Doc. 55-2 at p. 6 (Article 4(f)(iii)).
[69] *Id.* at p. 7 (Article 5(a)).
[70] *Id.* at p. 9 (Article 7(a)).

that the parties "shall" furnish working capital "when and as required for the performance of the Contract," but the Agreement explicitly creates a two-stage process for how such need is determined.  The Managing Party's own determination of the need for working capital is simply a necessary but not sufficient condition for the parties to be obligated to contribute capital.  If AWC's determination alone binds TMG, then the clause about unanimous Executive Committee approval being necessary for the determinations to be "binding and conclusive on the parties" would be entirely superfluous.  AWC offers no coherent explanation for how TMG can be bound by AWC's determinations absent unanimous approval of those determinations by the Executive Committee.

AWC contends that TMG's interpretation of Article 7(a) leads to absurd results.  For support of its position, AWC claims that the parties did not contemplate and would not have agreed that "the Project would come to a halt for want of working capital while the two JV partners grappled for more than 150 days over whether a working capital contribution should have been implemented."[71]  According to AWC, the Agreement "adopts a 'pay first–fight later' approach to working capital contributions" because the "exigencies of Project performance require a quick infusion of capital."[72]  In short, AWC argues that it would be absurd to allow TMG, a minority party, to hold up the Joint Venture by refusing to approve AWC's determinations of the need for working capital.

---

[71] R. Doc. 56 at p. 7.
[72] *Id*. at p. 6.

The Court disagrees that its reading of the plain language of the Agreement leads to absurd consequences. There is nothing unreasonable, let alone absurd, about requiring the unanimous consent of both parties to a joint venture as to a determination of when the parties owe working capital to the joint venture. Rational parties could agree to not be bound to the other party's determination alone unless and until all parties agreed, even where the exigencies of the situation may not favor unanimity. It is reasonable to expect that a minority party would not want to incur obligations solely at the discretion of the majority. Indeed, in one of the cases cited by the parties, *Lane Construction Corp. Skanska USA Civil Southeast, Inc. v. Impregilo*, the joint venture agreement at issue there provided that "[e]ach Party will contribute Working Capital when and as required by a unanimous vote of the Executive Committee," and that "[t]he need for Working Capital and the dates on which it is to be furnished shall be determined by the unanimous vote of Executive Committee."[73] While the Court recognizes that the actual language in the *Lane* agreement differs from the language in this agreement, the Court notes that AWC does not dispute that the parties in *Lane* entered into an agreement which required unanimous consent for capital determinations. The parties in that case contractually agreed to an arrangement which AWC deems absurd. The Court does not find anything absurd about its reading of the plain language of Article 7(a) nor does the Court find that it leads to absurd results.

---

[73] R. Doc. 56 at p. 16. The Court notes that the joint venture agreement in that case did provide for certain procedures "requir[ing] dissenting parties to continue to pay the calls while a challenge is pending." No. 6:21-CV-164-RBD-DCI, 2022 WL 3136845, at *2 (M.D. Fla. Jan. 10, 2022).

Under the Court's interpretation of the Agreement, either the Executive Committee unanimously approves the working capital contributions, at which point the contributions become binding upon the parties, or the Executive Committee fails to unanimously approve the contributions and one of the parties may elect to undergo Article 17's dispute resolution process. Indeed, the Court's interpretation of Article 7(a) gives effect to Article 17. That the Article 17 process may in hindsight cause too long of a delay in the need for a quick influx of working capital does not justify the Court to overlook the clear intent of the parties as expressed in the actual language they agreed upon.[74] There are no absurd consequences in giving Article 7(a) its plain meaning.

Finally, the Court does not find Article 7(e) to support AWC's argument. AWC claims that TMG's interpretation of Article 7(a) renders Article 7(e) unnecessary and meaningless because if "both JV partners have agreed to make the contributions, why is a mechanism needed to enforce the unanimous decision?"[75] AWC also argues that because Article 7(e) never mentions unanimity or Executive Committee approval, Article 7(e)'s default provisions apply whenever a party does not abide by the Managing Party's determination alone.[76] The Court addresses AWC's latter argument by reading Article 7(e) in context of Article 7(a). A party can only default on its obligations if the obligation was triggered in the first place. Thus, a party can

---

[74] Although AWC claims that the Article 17 process takes "more than 150 days," R. Doc. 56 at p. 7, much shorter periods of time to resolve disputes are possible. Indeed, Article 17 provides no minimum number of days to resolve disputes. The 150 days cited by AWC is the possible timeframe in which a party can initiate legal action should the dispute not be resolved by then, *i.e.*, should the Article 17 process be unsuccessful.

[75] *Id.* at p. 11.

[76] *Id.* at p. 10.

only be in default under Article 7(e) if it had an obligation to make capital contributions pursuant to Article 7(a), which, as discussed above, requires unanimous approval by the Executive Committee. As for the former argument that only AWC's interpretation gives Article 7(e) effect, the Court disagrees. Simply because both parties through their Executive Committee representative approved a working capital contribution does not obviate the need for an enforcement mechanism for that approval. Article 7(e) provides for possible consequences should a member of the Joint Venture fail to follow through on its promises. AWC's view that any party that makes an agreement necessarily will live up to that agreement, rendering any enforcing mechanism for breach of said agreement unnecessary, is without justification. As TMG rightly points out, "[i]f AWC's argument was correct, no contract would require any provision governing 'remedies,' because no party would breach its obligation."[77] As the party bringing claims for breach of contract, AWC's contention that once an agreement is reached it will not be broken is all the more absurd.

Having construed the relevant language in the Agreement, the Court next considers whether the relief sought by TMG—dismissal of any claims for monies allegedly lent by AWC to TMG through TMG's supposed breach of its obligations to make capital contributions—is warranted. The parties do not dispute that the Executive Committee did not approve any of AWC's working capital determinations from mid-2015 onwards. Based on the Court's interpretation of the Agreement, it

---

[77] R. Doc. 61 at p. 3.

follows that AWC's determinations themselves are not binding upon TMG given the lack of unanimous Executive Committee approval of those determinations. And without any underlying obligation to make the working capital contributions, TMG cannot be said to have been in default such that the provisions of Article 7(e) apply. Accordingly, the Courts grants TMG's Motion for Partial Summary Judgment to the extent it seeks dismissal of any and all claims related to TMG's purported failure to make working capital contributions.

## IV.   CONCLUSION

For the foregoing reasons,

**IT IS HEREBY ORDERED** that the Defendant's Motion for Partial Summary Judgment[78] is **GRANTED.**

New Orleans, Louisiana, February 16, 2024.

**WENDY B. VITTER**
**United States District Judge**

---

[78] R. Doc. 55.