## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **ARCHER WESTERN CONTRACTORS, LLC** | **CIVIL ACTION** |
| **VERSUS** | **NO. 22-5323** |
| **THE MCDONNEL GROUP, LLC** | **SECTION: D (5)** |

## ORDER AND REASONS

Before the Court is a Motion for Partial Summary Judgment filed by the Plaintiff, Archer Western Contractors, LLC.[1] Defendant, The McDonnel Group, LLC, opposes the Motion.[2] The Plaintiff filed a Reply in support of its Motion.[3] The Court ordered the parties to file supplemental briefing on the Motion[4]; both the Plaintiff and the Defendant filed a response to the Court's briefing Order.[5] The Court also held Oral Argument on the Motion.[6] After careful consideration of the parties' memoranda, the record, and the applicable law, the Court **GRANTS in part** and **DENIES in part** the Motion.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

This Court has previously detailed the factual background of the events germane to this lawsuit in several prior Orders.[7] Accordingly, the Court summarizes

---

[1] R. Doc. 58.
[2] R. Doc. 63.
[3] R. Doc. 71.
[4] R. Doc. 150.
[5] R. Doc. 151 (Plaintiff's Brief); R. Doc. 152 (Defendant's Response); R. Doc. 155 (Plaintiff's Reply).
[6] R. Doc. 156.
[7] *See* R. Docs. 50, 67 & 146.

the relevant background only as it relates to the instant Motion for Partial Summary Judgment.[8]

This case concerns the alleged failure of Defendant The McDonnel Group, LLC ("TMG") to abide by certain agreements and commitments made in a Joint Venture Agreement with Plaintiff Archer Western Contractors, LLC ("AWC"). On May 2, 2011, AWC and TMG entered into a Joint Venture Agreement (the "Agreement") establishing the McDonnel Group, LLC/Archer Western Contractors, Ltd. Joint Venture (the "Joint Venture") for the purpose of submitting a bid and obtaining a contract for the construction of the Orleans Parish Sheriff's Office Inmate Processing Center/Templeman III & IV Replacement Administration building (the "Project") from the Law Enforcement Division of Orleans Parish, State of Louisiana (the "Owner").[9] According to the terms of the Agreement, AWC and TMG are to share any profits and any losses accruing to the Joint Venture from performance of the Contract in accordance with their proportional interest in the Joint Venture. At the outset, AWC held a seventy percent share of the Joint Venture while TMG held the other thirty percent.[10] Not long after forming the Joint Venture, on July 28, 2011, the Joint Venture entered into a contract with the Owner to construct the Project (the "Contract").[11]

---

[8] For the purposes of the factual background, the Court considers AWC's Statement of Undisputed Material Facts, R. Doc. 58-1, and TMG's Statement of Contested Material Facts, R. Doc. 63-1. AMG's Undisputed Facts that are undisputed by AWC are Numbers 1–10, 24–29, 32, 34–35.
[9] R. Doc. 58-1 at ¶¶ 1–2.
[10] R. Doc. 58-4 at p. 3 (Article 3(a)).
[11] R. Doc. 58-1 at ¶ 5.

"To facilitate the handling of any and all matters and questions in connection with performance of the Contract," the Agreement establishes an Executive Committee comprised of one representative and one alternate from each party.[12] AWC largely controls the Executive Committee; the representatives of each party on the Executive Committee have "a vote equal to his party's Proportionate Share."[13] Although certain Executive Committee decisions may be determined by majority vote, Executive Committee decisions must be unanimous where "any other provision of th[e] Agreement specifies unanimous approval of the parties."[14]  In the event that the Executive Committee members "fail to reach a unanimous decision, the matter in question may at the election of any party hereto be referred to the Senior Officer of each of the parties for resolution pursuant to Article 17."[15]  The Agreement also designates AWC as the Managing Party of the Joint Venture, giving AWC "charge and supervision over the timely and satisfactory performance of the Contract, subject, however, to the superior authority and control of the Executive Committee."[16]

Several disputes arose during the performance of the contract between the Joint Venture and the Owner, resulting in the filing of several lawsuits in state court.[17]  The parties agree that by May 2015, the Owner's "wrongful failure to properly compensate the [Joint Venture] created critical cash flow issues for the [Joint Venture]."[18]  According to AWC, these cash flow problems required the Joint

---

[12] R. Doc. 58-4 at p. 4 (Article 4(a)).
[13] *Id.* at p. 5 (Article 4(c)).
[14] *Id.* at p. 5 (Article 4(c)).
[15] *Id.* at p. 6 (Article 4(c)).
[16] *Id.* at p. 7 (Article 5(a)).
[17] R. Doc. 58-1 at ¶¶ 10–11.
[18] *Id.* at ¶ 36.

Venture to obtain additional capital contributions from its constituent parties—AWC and TMG—in order to continue its work on the Project and to compensate subcontractors.[19]

It is at this point, May 2015, that the disputes within the Joint Venture relevant to the instant litigation started to take hold. The parties agree that beginning in mid-2015 and continuing until mid-2019, AWC, as Managing Party, made numerous determinations for working capital contributions from the parties and that TMG did not make any such contributions.[20] AWC paid TMG's share of capital contributions pursuant to Article 7(e) of the Agreement and deemed such payments to be demand loans made by AWC to TMG.[21] It is undisputed that the Executive Committee did not vote on or approve any of AWC's working capital determinations during the relevant time period either because TMG voted against the determinations or because TMG failed to attend the Executive Committee meetings.[22]

TMG separately entered into an Agreement of Compromise, Release, Assignment and Settlement, Agreement ("Settlement Agreement") with the Owner on April 29, 2022.[23] Per the Settlement Agreement, the Owner agreed to "settle the disputes with TMG individually and as a joint venturer in the JV with an assignment

---

[19] *Id.*
[20] *See* R. Doc. 58-1 at ¶ 39; R. Doc. 63-5, *Deposition of Allan McDonnel*, at p. 2; R. Doc. 58-3, *Affidavit of Michael Whelan*, at ¶ 18.
[21] *See* R. Doc. 58-3, *Affidavit of Michael Whelan*, at ¶ 20.
[22] *See* R. Doc. 63-12 at p. 4 ("TMG's representative wrongfully refused to vote in favor of needed working capital calls at the Executive Committee level."); R. Doc. 63-1 at ¶ 31; R. Doc. 63-5, *Deposition of Allan McDonnel*, at p. 2.
[23] R. Doc. 58-5.

and subrogation of and to the 30% rights of TMG as to the [Owner]" and to "issue a final payment in the amount of $2,700,000 to TMG for its share of the work performed by the JV on the Project."[24]  In return, TMG agreed to "assign[] and subrogate[] to the [Owner] any and all rights it possesses against the LED to the project funds either directly or as a 30% joint venturer in the JV and agree[d] to take any steps necessary to assure the [Owner] that it receives the rights under this assignment and subrogation of rights including the 30% share of any claims by the JV."[25]  TMG's president, Allan McDonnell, endorsed the $2,700,000 settlement check and deposited it into TMG's own bank account.[26]  TMG never shared any of the funds with either the Joint Venture or AWC.[27]

TMG and the Owner agreed to keep the terms of the Settlement Agreement confidential.[28]  Indeed, the parties have since stipulated that as of the date that TMG received payment in accordance with the terms of the Settlement Agreement, no employees or agents of TMG had ever informed any of AWC's agents or employees that TMG was negotiating or had executed the Settlement Agreement or any other agreement with the Owner.[29]  AWC eventually found out about the Settlement Agreement, prompting this lawsuit.

AWC filed the present lawsuit against TMG on December 16, 2022, alleging Breach of Contract in Count I, Breach of Fiduciary Duty in Count II, and Enrichment

---

[24] *Id.* at p. 5.
[25] *Id.* at p. 6.
[26] *See* R. Doc. 58-7; R. Doc. 58-1 at ¶ 24.
[27] R. Doc. 58-1 at ¶ 25.
[28] *See* R. Doc. 58-5 at p. 6.
[29] *See* R. Doc. 142-1.

Without Cause in Count III.[30]  AWC alleges in Count I that TMG breached the Joint Venture Agreement by (1) failing to provide necessary working capital contributions to the Joint Venture; (2) failing to pay back $6,096,407.00 in loans to AWC, representing capital contributions which AWC paid due to TMG's alleged default plus applicable interest; (3) failing to act in good faith in its participation in the Joint Venture Executive Committee by refusing to approve necessary requests for capital contributions and by refusing to attend and participate in Executive Committee meetings; (4) unilaterally assigning its interest in the Joint Venture's claims against the Owner to the Owner via the Settlement Agreement without the consent of either AWC or the Joint Venture; and (5) directing $2,700,000 in settlement funds from the Owner to TMG or TMG, Inc. otherwise due to the Joint Venture itself and the Joint Venture's subcontractors without the approval of either the Joint Venture or AWC.[31] As to Count I, AWC seeks damages, interest, attorney's fees, and costs, including the repayment of the full amount of the monies deemed to be loaned by AWC to TMG.[32] AWC also seeks specific performance by means of an order compelling TMG to place its settlement funds either in an escrow account or in the Joint Venture's bank account.[33]

---

[30] R. Doc. 1. The Court ordered AWC to file an Amended Complaint properly alleging the citizenship information of the parties to ensure that the Court has subject-matter jurisdiction over this action.  R. Doc. 4.  AWC subsequently filed an Amended Complaint.  R. Doc. 6.  Several months later, AWC filed a Second Amended Complaint clarifying certain factual allegations made in its Amended Complaint. R. Doc. 42.  The Court only considers the Second Amended Complaint here.

[31] R. Doc. 42 at ¶¶ 100–16.

[32] *Id.* at ¶¶ 117–18.

[33] *See* R. Doc. 151 at p. 13; R. Doc. 42 at ¶ 143.

As for Count II, Breach of Fiduciary Duty, AWC similarly alleges that TMG breached its fiduciary duty as its sole partner in the Joint Venture to AWC by (1) failing to act in good faith in its participation in the Executive Committee; (2) failing to make the required working capital contributions to the Joint Venture; (3) failing to repay the loan amounts to AWC created via AWC's funding of TMG's share of capital contributions; (4) secretly negotiating and entering into the Settlement Agreement with the Owner; (5) directing the $2,700,000 in settlement funds to TMG or TMG, Inc. without the knowledge or approval of the Joint Venture or AWC; and (6) damaging the Joint Venture and AWC's litigation and settlement positions with the Owner.[34]   AWC seeks damages, specific performance, interest, attorney's fees, and costs for Count II as well.[35]

In the instant Motion, AWC moves for summary judgment on its breach of contract and breach of fiduciary claims as well as its claim for recovery of interest on loans allegedly made to TMG due to TMG's default on its obligation to pay required working capital contributions.[36]   AWC claims that TMG's Settlement Agreement violates several provisions of the Joint Venture Agreement including prohibitions on unilaterally setting claims with the Owner and assigning interests in the Joint Venture's property.   As for its breach of fiduciary duty claim, AWC contends that TMG's "secretive" and "surreptitious" Settlement Agreement constitutes improper self-dealing and deceit in breach of the fiduciary duties owed to AWC.[37]   Lastly, AWC

---

[34] R. Doc. 42 at ¶¶ 119–29.
[35] *Id.* at ¶¶ 130–31.
[36] R. Doc. 58.
[37] R. Doc. 58-2.

moves for summary judgment on its claim for interest payments stemming from the contributions deemed loaned to TMG.

TMG filed a response in opposition to the Motion in which TMG primarily argues that it did not breach the Joint Venture Agreement because it settled only its own claims with the Owner and not those of the Joint Venture.[38]  TMG advises that the amount paid in settlement to TMG, $2,700,000.00, "gives the Sheriff a credit of $2,700,000.00 of any amount eventually paid to the JV by TMG foregoing such funds of any future amounts paid or owed."[39]  TMG also contends that AWC misreads and misconstrues several provisions in the Agreement which do not cover TMG's settlement discussions with the Owner.  According to TMG, a genuine factual dispute exists regarding the knowledge AWC had about TMG's negotiations with the Owner and the Settlement Agreement.  Finally, TMC disputes that it owes any interest payments on capital contributions to AWC because the Executive Committee never unanimously approved of the capital determinations.

AWC filed a reply in support of its Motion, accusing TMG of misconstruing Article 2 by placing limitations which do not appear in the language of the Agreement.[40]  AWC also argues that TMG incorrectly stated that TMG did not settle the Joint Venture's claim, explaining that TMG did not have its own individual claim with the Owner to settle in the first place and, "[r]ather, TMG's only interest in any claims against the LED/Sheriff arose from TMG's participation in the JV."[41]  Finally,

---

[38] R. Doc. 63.
[39] *Id.* at p. 5.
[40] R. Doc. 71.
[41] *Id.* at pp. 3–4.

AWC provides additional deposition testimony to support its argument that it was unaware of the Settlement Agreement.

The Court ordered the parties to file supplemental briefing to address several questions the Court had regarding AWC's remaining claims following the Court's Order and Reasons dismissing a portion of AWC's claim concerning the monies allegedly lent to TMG and whether AWC had Article III standing to pursue such claims.[42]  AWC filed a response to the Order, contending, *inter alia*, that TMG's Settlement Agreement with the Owner constitutes an injury in fact for standing purposes and that AWC's requested remedy—specific performance—is proper under Louisiana law and would redress AWC's injuries.[43]  AWC also articulated its position that AWC still has pending claims related to TMG's purported failure to make required capital contributions that survived the Court's prior Order and Reasons.

TMG filed a response to AWC's brief, primarily contesting AWC's claim that AWC still has pending claims related to the capital contributions.  TMG contends that this Court fully dismissed any and all claims related to TMG's failure to pay working capital and that AWC should not be allowed to seek any further relief.[44]  TMG also argues that AWC's breach of contract claim as it relates to the Settlement Agreement fails because AWC has not shown that it was damaged by the Settlement Agreement.

---

[42] R. Doc. 150.
[43] R. Doc. 151.
[44] R. Doc. 152.

AWC filed a Reply arguing that AWC has not abandoned its capital contribution claims and that AWC suffered damage as result of TMG's failure to make working capital contributions.[45]  AWC largely reiterates the arguments it made in its initial brief, contending that it suffered damages from the Settlement Agreement and that it is entitled to specific performance via an order directing TMG to place the settlement funds into the Joint Venture's bank account.

The Court held Oral Argument on the instant Motion as well as on TMG's Motion for Partial Summary Judgment–No Damages.[46]  During the Oral Argument, the parties further answered questions regarding the supplemental briefing.  AWC conceded that the portion of its Motion asking the Court to grant summary judgment on its capital contribution claims for monies loaned to TMG is moot in light of the Court's prior Order and Reasons dismissing such claim.  However, AWC articulated its position that it still has pending breach of contract and breach of fiduciary duty claims related to TMG's failure to make working capital contributions.  The Court took the matter under advisement and informed the parties that it would enter a written Order in this matter.

## II.  LEGAL STANDARD

Summary judgment is appropriate under Federal Rule of Civil Procedure 56 "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[47]  A dispute is "genuine" if it is

---

[45] R. Doc. 155.
[46] R. Doc. 156.
[47] Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).

"real and substantial, as opposed to merely formal, pretended, or a sham."[48]  Further, a fact is "material" if it "might affect the outcome of the suit under the governing law."[49]  When assessing whether a genuine dispute regarding any material fact exists, the Court considers "all of the evidence in the record but refrain[s] from making credibility determinations or weighing the evidence."[50]  While all reasonable inferences must be drawn in favor of the nonmoving party, a party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or "only a scintilla of evidence."[51]  Instead, summary judgment is appropriate if a reasonable jury could not return a verdict for the nonmoving party.[52]

If the dispositive issue is one on which the moving party will bear the burden of proof at trial, the moving party "must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial."[53]  The non-moving party can then defeat summary judgment by either submitting evidence sufficient to demonstrate the existence of a genuine dispute of material fact or by "showing that the moving party's evidence is so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of the moving party."[54]  If, however, the nonmoving party will bear the burden of proof at trial on the dispositive issue,

---

[48] *Bazan ex rel. Bazan v. Hidalgo Cnty.*, 246 F.3d 481, 489 (5th Cir. 2001) (citing *Wilkinson v. Powell*, 149 F.2d 335, 337 (5th Cir. 1945)).

[49] *Liberty Lobby*, 477 U.S. at 248.

[50] *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398–99 (5th Cir. 2008) (citations omitted).

[51] *Id.* (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)) (internal quotation marks omitted).

[52] *Id.* at 399 (citing *Liberty Lobby*, 477 U.S. at 248).

[53] *International Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1264–65 (5th Cir. 1991).

[54] *Id.* at 1265.

the moving party may satisfy its burden by merely pointing out that the evidence in the record is insufficient with respect to an essential element of the nonmoving party's claim.[55]  The burden then shifts to the nonmoving party who must go beyond the pleadings and, "by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"[56]

## III.   ANALYSIS

### A.   Standing

Jurisdiction, as always, comes first.[57]  Under Article III of the Constitution, federal courts only have jurisdiction to decide actual cases or controversies.[58] "Because of that limitation, any plaintiff invoking the 'judicial Power' must establish the 'irreducible constitutional minimum of standing.'"[59]  As standing is a prerequisite for subject matter jurisdiction, courts must raise and consider *sua sponte* whether a litigant has standing.[60]  To establish standing, "a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief."[61]

[55] *See Celotex*, 477 U.S. at 322–23.

[56] *Id.* at 324 (quoting Fed. R. Civ. P. 56(e)).

[57] *Calogero v. Shows, Cali & Walsh, L.L.P.*, 95 F.4th 951, 958 (5th Cir. 2024) (citing *E.T. v. Paxton*, 41 F.4th 709, 714 (5th Cir. 2022)).

[58] U.S. Const. art. III, § 2, cl. 1.

[59] *Lutostanski v. Brown*, 88 F.4th 582, 585 (5th Cir. 2023) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).

[60] *See Ford v. NYLCare Health Plans of Gulf Coast, Inc.*, 301 F.3d 329, 331–32 (5th Cir. 2002) (citing *SEC v. Forex Asset Mgmt., LLC*, 242 F.3d 325, 328 (5th Cir. 2001)); *see also id.* n.1 ("Article III standing must be addressed before all other issues 'because it determines the court's fundamental power even to hear the suit.'" (quoting *Rivera v. Wyeth–Ayerst Labs.*, 283 F.3d 315, 319 (5th Cir. 2002))).

[61] *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (citing *Lujan*, 504 U.S. at 560–61).

To ensure that this Court had Article III standing over AWC's claims regarding TMG's Settlement Agreement with the Owner, this Court ordered the parties to file supplemental briefing on the issue.[62]  AWC claims that it satisfies all three requirements for standing because (1) the Settlement Agreement inflicted injury on AWC, (2) that injury was caused by TMG, and (3) the injury is redressable by ordering TMG to place the $2,700,000 in settlement funds into the Joint Venture's bank account, congruent with the requirement of Article 8(a) of the Joint Venture Agreement.[63]  While not a model of clarity, TMG's briefing argues that AWC fails to establish the injury and redressability prongs of standing.[64]

The Court agrees with AWC.  First, AWC has demonstrated that it suffered an actual injury in fact.  "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'"[65]  The Fifth Circuit has held that a "breach of contract is a sufficient injury for standing

---

[62] R. Doc. 150.

[63] R. Doc. 151.

[64] R. Doc. 152.  Throughout its briefing, TMG conflates Article III standing with the merits of AWC's claims.  For example, TMG repeatedly contends that AWC cannot prove damages stemming from the Settlement Agreement and therefore cannot prevail on its breach of contract claim.   TMG, in turn, argues that this failure to prove damages means that AWC also cannot demonstrate an Article III injury.  Whether AWC can ultimately prevail on its claim, however, is an entirely different consideration than whether it has Article III standing to assert its claim.  "It is inappropriate for the court to focus on the merits of the case when considering the issue of standing." *Grant ex rel. Family Eldercare v. Gilbert*, 324 F.3d 383, 387 (5th Cir. 2003) (citing *Hanson v. Veterans Admin.*, 800 F.2d 1381, 1385 (5th Cir. 1986).  As the Supreme Court has repeatedly explained, "[j]urisdiction . . . is not defeated . . . by the possibility that the averments might fail to state a cause of action on which petitioners could actually recover." *Bell v. Hood*, 327 U.S. 678, 682 (1946)*; accord Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998) ("It is firmly established in our cases that the absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction, *i.e.*, the courts' statutory or constitutional power to adjudicate the case.").

[65] *Denning v. Bond Pharmacy, Inc.*, 50 F.4th 445, 451 (5th Cir. 2022) (citing *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016)).

purposes."[66]   Thus, because AWC alleges that TMG breached several provisions of the Joint Venture Agreement, those violations constitute an injury to a legally protected interest and therefore satisfy the injury in fact requirement.

While the breach alone is sufficient under Fifth Circuit precedent to constitute an injury in fact, AWC has nevertheless alleged an injury greater than the breach of the Joint Venture Agreement alone.  According to AWC, because the $2,700,000.00 that TMG received in settlement funds from the Owner rightfully belongs to the Joint Venture itself, AWC has had to fund the Joint Venture to a greater extent than if that money had been deposited into the Joint Venture's own account, as AWC seeks. As AWC explains, "AWC continues to incur out of pocket costs because it continues to solely fund the JV, while the JV continues to incur costs."[67]   That is, AWC's financial obligations have grown because its joint venture partner, TMG, has wrongfully withheld the settlement funds from the Joint Venture.  Accordingly, the Court finds that AWC has demonstrated an injury in fact.  That injury is also directly traceable to TMG, satisfying the second standing prong.  Finally, AWC's injury is also redressable.  AWC's injury concerns TMG's wrongful withholding of settlement funds from the Joint Venture.  While the Court cannot undo the Settlement Agreement, the Court can redress AWC's injury by ordering TMG to place the $2,700,000.00 in settlement funds into the Joint Venture's bank account.  AWC has shown that its

---

[66] *Id.*; *see also Attias v. CareFirst, Inc.*, No. 15-CV-882, 2024 WL 1344401, at *7 (D.D.C. Mar. 29, 2024) ("The Fifth Circuit has embraced the position, previously adopted by the D.C. Circuit in *Alston*, that a contractual breach is all that's required to pursue a contract claim.").  *But see Dinerstein v. Google, LLC*, 73 F.4th 502, 518–522 (7th Cir. 2023) (holding that a breach of contract alone does not constitute a legally cognizable injury in fact).

[67] R. Doc. 155 at p. 6.

injury "would likely be redressed by judicial relief."[68]  Therefore, the Court finds that
AWC has Article III standing to pursue its claims against TMG regarding the
Settlement Agreement.

**B.    AWC's Claims**

On the merits, AWC asks the Court to rule that (1) TMG breached the Parties'
Joint Venture Agreement; (2) TMG breached its fiduciary duty to AWC; and (3) TMG
owes AWC accrued interest on amounts that AWC paid in working capital in excess
of AWC's proportionate share.  The Court addresses each of AWC's arguments in
turn.

**i.    Breach of Contract**

The first question before the Court is again one of contract interpretation: did
TMG violate the Agreement by separately negotiating and entering into a settlement
agreement with the Owner without the consent of either AWC or the Joint Venture
itself?  Because the Court finds that TMG's settlement agreement with the Owner
constitutes a breach of the Agreement, the Court grants AWC's Motion as to this
claim.

To assert a claim for breach of contract under Louisiana law, a plaintiff must
demonstrate "(1) the obligor's undertaking an obligation to perform, (2) the obligor
failed to perform the obligation (the breach), and (3) the failure to perform resulted
in damages to the obligee."[69]  Put differently, the elements of a breach of contract are

---

[68] *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021).
[69] *Favrot v. Favrot*, 2010-0986 (La. App. 4 Cir. 2/9/11), 68 So. 3d 1099, 1109, *writ denied*, 2011-0636
(La. 5/6/11), 62 So. 3d 127 (citing *1436 Jackson Joint Venture v. World Constr. Co., Inc.*, 499 So. 2d
426, 427 (La. App. 4 Cir. 1986)).

the existence of an agreement, a breach of that agreement, and damages resulting from that breach.   Here, the parties dispute whether TMG breached any provision of the Agreement and whether AWC suffered damages as a result of the alleged breaches.

Under Louisiana law, contract interpretation "is the determination of the common intent of the parties."[70]  "When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent."[71]   Further, "[t]he words of a contract must be given their generally prevailing meaning."[72]  A court should not construe a contractual term or phrase in isolation.   Rather, "[e]ach provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole."[73]  With these principles in mind, the Court considers the language of the Agreement.

### a.   *Article 2(b)*

AWC first argues that TMG violated Article 2(b) by unilaterally engaging in settlement negotiations with the Owner.[74]   Article 2(b) of the Agreement provides: "Any negotiations with the Owner . . . subsequent to the submission of the bid, whether before or after the awarding of the Contract, shall be conducted by the Executive Committee defined later herein."[75]  It is undisputed that TMG's Settlement

---

[70] La. C.C. art. 2045.
[71] La. C.C. art. 2046.
[72] La. C.C. art. 2047.
[73] La. C.C. art. 2050.
[74] R. Doc. 58-2 at p. 5.
[75] R. Doc. 58-4 at p. 2 (Article 2(b)).

Agreement did not involve the Executive Committee in any way.[76]  Accordingly, AWC contends that Article 2(b) barred TMG from directly negotiating with the Owner without Executive Committee involvement or approval.

In response, TMG accuses AWC of stretching Article 2(b) to cover negotiations with the Owner which postdate the bidding and consummation of the Contract.[77] TMG claims that Article 2 is limited only to the "Bid" and any contract entered as a result thereof and that "[n]o mention is made of settling claims asserted by the Sheriff against one of the parties individually."[78]

TMG's response falls flat.  Although Article 2 is entitled "Bid," the plain language of Article 2(b) supports AWC's reading that Article 2(b) is not limited solely to the bidding process.  Not only does Article 2(b) only apply "subsequent to the submission of the bid," it covers negotiations "whether before or *after* the awarding of the Contract."[79]  That is, Article 2(b) specifies that negotiations with the Owner *after* the bid has been submitted and *after* the Contract has been awarded shall be conducted by the Executive Committee.  There is no textual support for TMG's argument that this provision is limited only to the bidding process.  Indeed, the express language contradicts such a reading, covering negotiations "after the awarding of the Contract."  Article 2(b) has no expiration date after which negotiations with the Owner can be held absent the Executive Committee.  Rather,

---

[76] *See* R. Doc. 58-5 at p. 5 ("Whereas, the JV has NOT agreed to this settlement proposal . . . .").
[77] R. Doc. 63 at p. 10.
[78] *Id.*
[79] R. Doc. 58-4 at p. 2 (Article 2(b)) (emphasis added).

all negotiations "subsequent to the submission of the bid" shall be through the Executive Committee.

TMG's reading would have this Court limit Article 2(b)'s scope to negotiations "after the awarding of the Contract" but before the parties execute any contract. Such temporal restriction appears nowhere in the Agreement, however, and the Court will not insert language to contradict or modify the parties' intent.[80]  Moreover, to the extent that TMG relies upon the title of Article 2, "Bid," to support its reading, the Court concurs with AWC that Article 23's instruction that "[t]he captions and headings used herein are for convenience and reference only and shall not limit or expand, or be referred to in interpreting or construing the provisions hereof" dispenses with TMG's argument.[81]

Further, Article 2(b)'s requirement that "any negotiations . . . *shall* be conducted by the Executive Committee" implies that no single member of the Joint Venture may conduct negotiations with the Owner on its own.[82]  "Unlike the word 'may,' which implies discretion, the word 'shall' usually connotes a requirement."[83] While such unilateral negotiations are not directly prohibited, the import of "shall" is clear—no negotiations may take place without the Executive Committee.  Article 2(b)

---

[80] *See* La. C.C. art. 2046.

[81] R. Doc. 58-4 at p. 19 (Article 23(a)); R. Doc. 71.

[82] A negotiation conducted by a single member of the Joint Venture is by definition one *not* conducted by the Executive Committee, in contravention of Article 2(b)'s dictate that *any* negotiation must be conducted by the Executive Committee.

[83] *Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 171 (2016); *accord Contraband Cove v. Daly*, 527 So. 2d 534, 537 (La. 3 Cir. 1988) ("The word 'shall' in the partnership agreement should be given the same connotation, thus creating a mandatory obligation.").

grants the Executive Committee the exclusive authority to conduct any and all negotiations with the Owner.

Article 2(b) mandates that "any negotiations with the Owner . . . after the awarding of the Contract . . . shall be conducted by the Executive Committee."[84]  It is undisputed that TMG unilaterally negotiated with the Owner to settle claims without the presence, consent, or approval of the Executive Committee.[85]  Those negotiations took place "after the awarding of the Contract," thus placing them within the ambit of Article 2(b).  It follows that TMG's negotiations with the Owner contravened Article 2(b)'s requirement that any such negotiations be conducted by the Executive Committee.  Accordingly, the Court finds that TMG breached Article 2(b) of the Agreement.

### b.   *Article 2(c)*

AWC next contends that TMG violated Article 2(c) by withholding the $2,700,000.00 in settlement funds from the Joint Venture without the AWC's written consent.[86]  Article 2(c) provides, in relevant part: "none of the parties to this Agreement shall, without the previous written consent of the other party, directly or indirectly bid for or take any interest for its own benefit in the execution or carrying out of the construction of the Project or any part thereof or any services preparatory thereto."[87]  TMG's response mirrors its response to the alleged breach of Article 2(b),

---

[84] R. Doc. 58-4 at p. 2. Article 2(b) reads, in its entirety: "Any negotiations with the Owner or any sureties, subsequent to the submission of the bid, whether before or after the awarding of the Contract, shall be conducted by the Executive Committee defined later herein, and costs related thereto shall be borne by the Joint Venture."
[85] R. Doc. 142-1.
[86] R. Doc. 58-1 at pp. 5–6.
[87] R. Doc. 58-4 at p. 2 (Article 2(c)).

*i.e.*, that Article 2 only governs the bidding process and negotiation of the contract and does not pertain to settlement agreements more than a decade later.[88]

The Court does not find that TMG's Settlement Agreement with the Owner constitutes a breach of Article 2(c), albeit for reasons different than those espoused by TMG.  The plain language of Article 2(c) generally prohibits a party from either bidding or taking any interest for its own benefit in the execution or carrying out of the construction of the Project.[89]  TMG is not alleged to have made any bid, either directly or indirectly, through the Settlement Agreement.  Further, by settling claims with the Owner in exchange for money, TMG did not "take any interest for its own benefit in the execution or carrying out of the construction of the Project."[90]  Instead, TMG settled its own preexisting interest as a member of the Joint Venture and assigned and subrogated that interest to the Owner.[91]  AWC does not explain how TMG took any interest in the Project by agreeing to the Settlement Agreement with the Owner.  Because TMG's actions do not constitute a violation of the express language of Article 2(c), the Court finds that TMG did not breach that provision.

---

[88] R. Doc. 63 at p. 10.
[89] Article 2(c) provides, in its entirety: "Except as provided in this Agreement, during the term of the Agreement none of the parties to this Agreement shall, without the previous written consent of the other party, directly or indirectly bid for or take any interest for its own benefit in the execution or carrying out of the construction of the Project or any part thereof or any services preparatory thereto and each of the parties shall do all in its power to ensure the observance of this prohibition by all persons from time to time in its employment and all of its affiliates and subsidiaries or parent company as defined by Federal or State law."
[90] R. Doc. 58-4 at p. 2 (Article 2(c)).
[91] R. Doc. 58-5 at pp. 5–6.

### c.   Article 4(c)(vi)

AWC next argues that TMG violated Article 4(c)(vi) by settling TMG's portion of the Joint Venture's claims against the Owner without first receiving the unanimous approval of the Executive Committee.[92]  Article 4(c)(vi) provides that "any decision to initiate or settle significant claims against the Owner" shall be by the unanimous decision of the Executive Committee.[93]  Because TMG never received unanimous Executive Committee approval to settle claims with the Owner, AWC argues, TMG violated Article 4(c)(vi).

TMG responds that AWC misconstrues the Settlement Agreement by characterizing it as settling the claims of the Joint Venture.[94]  Instead, TMG argues, TMG only settled its own individual claims against the Owner, not those of the Joint Venture.  Thus, TMG maintains, it did not need unanimous Executive Committee approval to settle what it purports to be TMG's claim with the Owner.

The Court agrees with AWC that TMG violated Article 4(c)(vi).  Article 4(c)(vi) dictates that decisions to settle significant claims with the Owner must be by unanimous Executive Committee approval.  Allowing for a single member to settle significant claims with the Owner related to the Project flies in the face of Article 4(c)(vi)'s clear intent.  Were TMG or AWC able to unilaterally settle portions of the Joint Venture's claims against the Owner, Article 4(c)(vi) would be a nullity.  There is no need to require not only Executive Committee approval but *unanimous* approval

---

[92] R. Doc. 58-2 at pp. 6–7.

[93] R. Doc. 58-4 at p. 5 (Article 4(c)(vi)).

[94] R. Doc. 63 at p. 11.

if the Agreement permitted unilateral settlement by one of the members.  The Court will not construe the Agreement in a way which renders any provision superfluous.

As the Court discusses in greater detail below, TMG did not simply settle its own independent claim[95] against the Owner, but its share of the Joint Venture's claim against the Owner.  The Court rejects TMG's arguments to the contrary.  Because TMG settled a significant portion of the Joint Venture's claims without unanimous Executive Committee approval, TMG's Settlement Agreement violated the clear language of Article 4(c)(vi).[96]

### d.   Article 8(a)

Article 8(a) states that "all of the funds received by the Joint Venture or by *any of the parties* on behalf of the Joint Venture in connection with the performance of said Contract shall be deposited" in the Joint Venture's bank account.[97]  AWC maintains that TMG violated this Article by failing to deposit the $2,700,000.00 in settlement funds it received from the Owner into the Joint Venture's bank account.[98] TMG does not dispute that it deposited the settlement check into its own bank account.  Rather, TMG maintains its argument that it settled only its own rights against the Owner, not those of the Joint Venture, and, thus, that it did not violate

---

[95] There is no evidence that TMG had any independent claim against the Owner to settle in the first place.

[96] TMG does not argue that the claims involved were not "significant."  Although the Agreement does not define what a "significant" claim is, the Court finds that the claims involved in the ongoing JV-Owner litigation constitute "significant" claims.  Those claims involve millions of dollars and have been disputed for the better part of a decade.  They are "significant" under any plausible definition of the word.

[97] R. Doc. 58-4 at p. 10 (Article 8(a)) (emphasis added).

[98] R. Doc. 58-2 at pp. 7–8.

Article 8(a).[99]  As TMG made clear at Oral Argument, the thrust of TMG's argument is that the funds it received under the Settlement Agreement were not "on behalf of the Joint Venture in connection with the performance of said Contract."

TMG's argument is fruitless.  That the Settlement Agreement did not purport to fully settle the entirety of the Joint Venture's claims against the Owner is irrelevant.  TMG received funds due to its role as a member of the Joint Venture in connection with the Project.  TMG cannot dispute that the Settlement Agreement itself states that TMG appeared "individually and *as a joint venturer* in The McDonnel Group, L.L.C./Archer Western Contractors, Ltd. Joint Venture."[100]  As AWC points out, the Settlement Agreement provides that the Owner "will issue a final payment in the amount of $2,700,000 to TMG for its share of the work performed by the JV on the Project."[101]  That is, the Settlement Agreement itself provides that the Owner agreed to pay TMG money for work that TMG performed on the Project as a Joint Venture member.  The Settlement Agreement thus confirms that the settlement funds are inextricably linked to TMG's role in the Joint Venture.  While TMG may have been named individually in the lawsuits with the Owner, that does not change the fact that TMG's involvement stems entirely from its membership in the Joint Venture; TMG had no individual claims to settle with the Owner separate

---

[99] R. Doc. 63 at p. 11.

[100] R. Doc. 58-5 at p. 1 (emphasis added). In its Statement of Undisputed Material Facts, AWC included "LED paid the settlement funds to TMG 'for [TMG's] share of the work performed by the JV on the project.'" R. Doc. 58-1 at ¶ 21. TMG's Statement of Contested Material Facts responds: "Disputed and not material" and references a statement made by Jack Capella, TMG's representative, in his deposition that "The claim made by Archer Western and the claims made by the contractors and the claims made, they're—they're just numbers.  They're claims." R. Doc. 63-1 at ¶ 21. It is lost on the Court how TMG's response demonstrates a material factual dispute.

[101] R. Doc. 58-5 at p. 6.

and apart from the Joint Venture's own claim as reflected by the state court reconventional demand.[102]   Moreover, as this Court discussed above, TMG had no right to unilaterally negotiate with the Owner or to settle any claims with the Owner without unanimous Executive Committee approval.[103]   TMG cannot now claim that it settled only its own portion of the Joint Venture's claims against the Owner and disregard the fact that it was only due any money from the Owner because TMG is a member of the Joint Venture.

The Settlement Agreement further states, TMG agreed to accept the final payment "due to it for its 30% of the project under the Joint Venture Agreement" and "accept such as full payment of its share of the claims by the JV against the [Owner]."[104]   TMG further agreed to "assign[] to and subrogate[] the [Owner] to any and all rights to its 30% share of the claims by it or the JV against the [Owner] for the Project."[105]   This assignment of rights further demonstrates that it is the Joint Venture's claim itself, or, more precisely, a share of the Joint Venture's claim, which TMG settled with the Owner.   Were TMG settling its own individual claim, as it argues, there would be no need for such assignment and subrogation.   Viewed in favor of TMG, the evidence before the Court shows no genuine dispute that TMG settled with the Owner "on behalf of the Joint Venture in connection with the performance of said Contract."[106]

---

[102] *See* R. Doc. 71-1 at pp. 9–12.
[103] *See* Parts III.B.i.a. & III.B.i.c.
[104] R. Doc. 58-5 at pp. 5–6.
[105] *Id.* at p. 6.
[106] R. Doc. 58-4 at p. 10 (Article 8(a)).

The settlement figures confirm this view.   According to the Settlement Agreement, the Owner offered the Joint Venture, *inter alia*, the sum of $9,000,000 to settle all outstanding claims.[107]   While the Joint Venture rejected such settlement, TMG nevertheless chose to settle its disputes with the Owner "as a joint venturer in the JV."[108]   Indeed, the Settlement Agreement states that the Owner "has agreed to make a final settlement to TMG to settle all claims by TMG against the [Owner] in the amount of 30% of $9,000,000."[109]   TMG maintained a thirty percent stake in the Joint Venture.[110]   Thirty percent of the overall $9,000,000 settlement amount offered to the Joint Venture as a whole is $2,700,000.00, the amount received by TMG in the settlement with the Owner.[111]   Although TMG hangs its argument on the Settlement Agreement's recognition that the Joint Venture did not authorize or agree to the settlement, the Court cannot ignore the fact that TMG's only connection to the Owner is through the Joint Venture and that the Settlement Agreement also states that TMG appeared in its capacity as part of the Joint Venture.[112]   That TMG could not, under the Joint Venture Agreement, negotiate with the Owner does not mean that TMG did not act on behalf of the Joint Venture, albeit improperly, as it was the Joint Venture's claim that TMG settled.

---

[107] R. Doc. 58-5 at p. 5. ("WHEREAS the [Owner] has offered to settle all claims with the JV by: the [Owner] will pay the sum of $9,000,000 to the JV[.]").

[108] *Id.*

[109] *Id.*

[110] R. Doc. 58-4 at p. 3 (Article 3(a)).

[111] R. Doc. 58-7.

[112] R. Doc. 58-5 ("By this agreement, the Law Enforcement District of the Parish of Orleans and Marlin N. Gusman in his official capacity as Sheriff of Orleans Parish, State of Louisiana, on the one hand, and The McDonnell Group, individually and as a joint venturer in The McDonnell Group, L.L.C./Archer Western Contractors, Ltd, Joint Venture, on the other hand . . .").

Because TMG was settling a portion of the Joint Venture's overall claim with the Owner, the Court finds that Article 8(a)'s requirement that any payments received by the parties be deposited into the Joint Venture bank account was triggered. It follows that TMG's deposit of the $2,700,000.00 settlement check into its own bank account constitutes a breach of Article 8(a).

### e.  *Article 14*

Next, AWC argues that TMG breached Article 14 by distributing the settlement funds to itself without the unanimous approval of the Executive Committee.[113] Article 14(a) provides that "[t]he Executive Committee may determine from time to time during the course of the Work, that some of the Assets held and acquired by the Joint Venture may be divided among or paid to the parties."[114] Article 4(c)(v) dictates that any such decision by the Executive Committee to divide or pay any assets to the parties "prior to the completion of the Joint Venture" shall be by unanimous decision of the Executive Committee.[115] AWC claims that "any distribution to an individual joint venture partner of assets such as settlement funds received pursuant to the Secret Agreement requires unanimous Executive Committee approval."[116]

The Court disagrees with AWC. TMG's Settlement Agreement does not implicate Article 14 because the funds received by TMG via the Settlement Agreement never were "assets held and acquired by the Joint Venture." Without

---

[113] R. Doc. 58-2 at pp. 8–9.
[114] R. Doc. 58-4 at p. 15 (Article 14(a)).
[115] *Id*. at p. 5 (Article 4(c)(v)).
[116] R. Doc. 58-2 at pp. 8–9.

addressing whether the assets were properly or improperly held by TMG, it is not disputed that TMG's settlement assets were held and acquired by TMG itself. Indeed, AWC's entire argument throughout this litigation has been that the settlement funds *should have* been "held and acquired by the Joint Venture," but were improperly withheld by TMG. AWC fails to explain how the $2,700,000.00 settlement check deposited into TMG's personal account constitutes an asset "held and acquired by the Joint Venture." The Court finds that TMG did not breach Article 14.

### f.   *Article 16(a)*

AWC next contends that TMG violated Article 16(a) by assigning to the Owner its rights to the Joint Venture's claims against the Owner without first obtaining AWC's written consent.[117] Article 16(a) provides, in relevant part:

> [N]o party may assign, transfer, pledge or hypothecate its interest, whether directly or by merger with or acquisition by another entity, or any part thereof, in the Joint Venture or in the Contract or in this Agreement or in any property or monies of the Joint Venture except with prior written consent of the other party and upon such terms as it may reasonably require.[118]

As part of its Settlement Agreement, TMG agreed to "assign[] to and subrogate[] the [Owner] to any and all rights to its 30% share of the claims by it or the JV against the [Owner] for the Project."[119] Elsewhere, TMG agreed to "assign[] to and subrogate[] to the [Owner] any and all rights it possesses against the [Owner] to the project funds either directly or as a 30% joint venturer in the JV"[120] and to "take any

---

[117] *Id.* at pp. 9–10.
[118] R. Doc. 58-4 at p. 17 (Article 16(a)).
[119] R. Doc. 58-5 at p. 6.
[120] *Id.*

steps necessary to assure the [Owner] that it receives the rights under this assignment and subrogation of rights including the 30% share of any claims by the JV."[121]  In other words, TMG assigned its rights as a member of the Joint Venture to any claims by the Joint Venture against the Owner directly to the Owner.  It is undisputed that TMG never obtained AWC's written consent prior to signing the Settlement Agreement.  AWC therefore claims that this amounts to a straightforward violation of Article 16(a)'s prohibition on assigning any interest in the Joint Venture or any property thereof.

While not disputing that Article 16(a) of the Joint Venture Agreement bars any party from assigning its interest in the JV, the Contract, or the JVA without the prior written consent of the other party,[122] TMG resists this conclusion, arguing that it never assigned any interest to the Owner (1) in the Joint Venture itself or (2) in any money or property of the Joint Venture.[123]  As to TMG's first point, the Court agrees. TMG did not "transfer, pledge or hypothecate its interest" in the Joint Venture; TMG maintained its 30% share in the Joint Venture.  Moreover, AWC does not argue that TMG did so through the Settlement Agreement.  The Owner received no interest in the Joint Venture itself.

TMG's argument that it did not assign its interest in any *property* of the Joint Venture does not stand up to scrutiny, however.  TMG explicitly assigned to the Owner its rights to its 30% share of the Joint Venture's claims against the Owner,

---

[121] *Id.*
[122] *See* AWC's Statement of Undisputed Material Facts, R. Doc. 58-1 at ¶ 34 and TMG's Statement of Contested Material Facts, R. Doc. 63-1 at ¶ 34.
[123] R. Doc. 63 at pp. 11–13.

*i.e.*, its interest in the Joint Venture's legal claims.[124]   TMG claims, without any citation, that a legal claim "does not constitute 'property' under a legal application."[125] Louisiana law, however, is to the contrary.  "Once a party's cause of action accrues, it becomes a vested property right that may not constitutionally be divested."[126]  A legal claim thus is a species of property under certain circumstances.[127]  Here, there is no question that the Joint Venture's claims have accrued given the ongoing litigation in state court at the time of the Settlement Agreement and the fact that the Settlement Agreement itself acknowledges that the Owner tried unsuccessfully to settle the Joint Venture's claims for $9,000,000.[128]   Contrary to TMG's contention, the Joint Venture's claims are not merely speculative or "inchoate," they are currently being litigated.   The alleged injuries have already occurred.[129]   Accordingly, the Joint Venture's claims against the Owner regarding the Project are a type of property belonging to the Joint Venture.  TMG's assignment of its interest in the Joint Venture's claims against the Owner without the written consent of AWC therefore constitutes an express violation of Article 16(a).

---

[124] R. Doc. 58-5 at p. 6 ("[A]ssigns to and subrogates the [Owner] to any and all rights to its 30% share of the claims by it or the JV against the [Owner] for the Project.").

[125] R. Doc. 63 at pp. 12–13.

[126] *Austin v. Abney Mills, Inc.*, 2001-1598 (La. 9/4/02), 824 So. 2d 1137, 1145 (quoting *Cole v. Celotex Corp.*, 599 So. 2d 1058, 1063 (La. 1992)).

[127] *See Pritchard v. Norton*, 106 U.S. 124, 132 (1882) ("Hence it is that a vested right of action is property in the same sense in which tangible things are property, and is equally protected against arbitrary interference.").

[128] *See* R. Doc. 58-5 at p. 5 ("WHEREAS the [Owner] has offered to settle all claims with the JV by: the [Owner] will pay the sum of $9,000,000 to the JV[.]").

[129] *See Burmaster v. Gravity Drainage Dist. No. 2 of St. Charles Par.*, 366 So. 2d 1381, 1387 (La. 1978) ("Where an injury has occurred for which the injured party has a cause of action, such cause of action is a vested property right which is protected by the guarantee of due process.").

TMG also argues that AWC has failed to demonstrate how it was damaged by TMG's purported assignment of interest to the Owner, causing AWC's claim to fail. This is an overly narrow view of AWC's claim. TMG treats this as though it were its own standalone breach of contract claim. However, Article 16(a) is just one of several provisions alleged by AWC to have been violated by TMG's Settlement Agreement, the existence of which AWC alleges caused it harm. AWC's damages for the alleged violation of Article 16(a) are part and parcel of its overall damages stemming from TMG's Settlement Agreement, which the Court addresses below. TMG's assignment of interests in violation of Article 16(a) is but one way in which TMG breached the overall Agreement through its Settlement Agreement. That AWC did not trace exactly how each way in which TMG allegedly breached the Agreement through its Settlement Agreement caused it to suffer damages is of no moment. There is no genuine dispute as to any material fact that AWC has shown that TMG breached the Agreement and that AWC suffered damages as a result. That is sufficient to grant summary judgment at this stage.

### g.   *Article 21*

AWC claims that Article 21 barred TMG from advertising its work on the Project without first obtaining approval from the Executive Committee.[130] This allegation, however, appears nowhere in AWC's operative Second Amended Complaint.[131] AWC is limited only to the claims it brought in its Second Amended

---

[130] R. Doc. 58-2 at p. 10.

[131] AWC's Second Amended Complaint, R. Doc. 42, makes no mention whatsoever of Article 21 or any advertising done by TMG without the approval of AWC or the Joint Venture.

Complaint and cannot raise new claims in a summary judgment motion.[132]  Moreover, as TMG points out, AWC provides no explanation or evidence as to how it was damaged by TMG's alleged breach of Article 21.  TMG's advertising of its work on the Project is unrelated to its Settlement Agreement with the Owner and thus any damages from the Settlement Agreement do not pertain to TMG's advertising.  Because this allegation appears nowhere in AWC's Complaint, the Court finds that AWC is not entitled to summary judgment on this allegation.

### h. Damages and Remedy

In both its supplemental briefing on this Motion and in its own Motion for Partial Summary Judgement–No Damages, TMG argues that AWC has failed to show that it was damaged by the Settlement Agreement and therefore that AWC's breach of contract claims necessarily fail.[133]  TMG focuses on the 30(b)(6) deposition testimony of AWC's representative Michael Whelan where Whelan stated that AWC has not lost any jobs because of the Settlement Agreement and that he did not know yet whether the Joint Venture was harmed by the Settlement Agreement.[134]  TMG also correctly notes that AWC does not seek any monetary damages for its breach of contract claim; AWC's only requested remedy is for the Court to order TMG to place the settlement funds into the Joint Venture's bank account.[135]

---

[132] See U.S. ex rel. DeKort v. Integrated Coast Guard Sys., 475 Fed. Appx. 521, 522 (5th Cir. 2012) (finding no error where a district court denied a motion for summary judgment which attempted to raise a new claim not asserted in any prior complaint); see also Gilmour v. Gates, McDonald and Co., 382 F.3d 1312, 1314–15 (11th Cir. 2004) ("[T]he Supreme Court has mandated a liberal pleading standard for civil complaints. . . . This standard however does not afford plaintiffs with an opportunity to raise new claims at the summary judgment stage.").

[133] See R. Docs. 124 & 152.

[134] See R. Doc. 124-3 at pp. 2–3, 6–9.

[135] See R. Doc. 151 at p. 13; R. Doc. 131-4 at p. 5.

To the extent that TMG argues that AWC's request for specific performance alone without any monetary damages dooms AWC's breach of contract claim as a matter of law, such argument conflicts with Louisiana law. "Under Louisiana's civil law system, specific performance is the preferred remedy for breach of contract. An obligee enjoys the right to demand, insofar as is practicable, the specific performance of the obligation."[136] Louisiana Civil Code article 1986 recognizes the remedy of specific performance as the default remedy for breach of contract and provides that monetary damages may also be granted "if the obligee so demands" or "[i]f specific performance is impracticable."[137] A plain reading of article 1986 suggests that specific performance alone may be ordered by a court without any need by the plaintiff to also request or prove monetary damages, so long as specific performance is practicable.[138] The Louisiana Supreme Court has explained that "in a civil case, an aggrieved party may prefer specific performance of an obligation rather than the payment of money."[139] Further, as one leading commentator on Louisiana law has put it, "[a] court . . . may not limit an obligee's right to the mere recovery of damages when all circumstances required for the granting of specific performance are

---

[136] *Charter Sch. of Pine Grove, Inc. v. St. Helena Par. Sch. Bd.*, 2007-2238 La. App. 1 Cir. 2/19/09, 9 So. 3d 209, 222 (citing *Lombardo v. Deshotel*, 94–1172 (La. 11/30/94), 647 So. 2d 1086, 1090).

[137] La. C.C. art. 1986.

[138] *See Bourgeois v. Dunn*, 2001-1185 (La. App. 1 Cir. 6/21/02); 822 So. 2d 708, 711 ("When specific performance is impracticable or when the court, in its discretion, refuses to grant specific performance of an obligation to do, the court may instead fix damages.").

[139] *Ogea v. Merritt*, 2013–1085, p. 21 n. 11 (La. 12/10/13); 130 So. 3d 888, 902 n. 11; *accord J. Weingarten, Inc. v. Northgate Mall, Inc.*, 404 So. 2d 896, 900 (La. 1981) ("[W]e reject the common law view that the obligee must first clear the inadequacy of damage-irreparable injury hurdle before invoking the remedy [of specific performance].").

present."[140]  Therefore, that AWC does not seek monetary damages on its claim does not mean that its breach of contract claim fails or that it cannot seek specific performance.[141]  To hold otherwise would be inconsistent with Louisiana law.

AWC has proven that TMG violated the express provisions of the parties' Joint Venture Agreement by settling its portion of the Joint Venture's claims with the Owner without the approval of either the Joint Venture or AWC and depositing the settlement funds in its own account rather than in the Joint Venture's account.  To remedy that breach, AWC demands specific performance pursuant to Louisiana Civil Code article 1986 ordering TMG to place the settlement funds into the Joint Venture's bank account.  TMG has not shown specific performance to be impossible or impracticable.  The Court finds specific performance to be warranted in this matter and therefore grants AWC's Motion as to this claim.

### ii.  Breach of Fiduciary Duty

To prevail on a claim of breach of fiduciary duty under Louisiana law, AWC must demonstrate (1) the existence of a fiduciary duty on the part of TMG to AWC, (2) that TMG took an action in violation of that duty, and (3) that AWC suffered damages as a result of that action.[142]  Further,  a claim for breach of fiduciary duty

---

[140] *Reparation in money vs. reparation in kind*, 6 La. Civ. L. Treatise, Law Of Obligations § 3.4 (2d ed.); *see also Girault v. Feucht*, 117 La. 276, 41 So. 572, 573–74 (1906) (distinguishing between damages and specific performance).

[141] Of course, if a plaintiff seeks to recover monetary damages, it bears the burden of proving those damages.  But it does not follow that a plaintiff must prove damages where the plaintiff seeks specific performance, not monetary damages.

[142] *See Hall v. Habul*, No. CIV.A. 13-406, 2014 WL 2441177, at *2 (M.D. La. May 30, 2014) (citing *Omnitech Int'l v. Clorox Co.*, 11 F.3d 1316, 1330 n. 20 (5th Cir. 1994)).

requires "proof of fraud, breach of trust or an action outside the limits of the fiduciary's authority."[143]

There is no dispute that the first element—the existence of a fiduciary duty— is met here.  Neither party disputes that "TMG has a fiduciary duty to the JV."[144] Louisiana law is clear that members of a joint venture, like partners in a partnership, owe one another fiduciary duties.[145]  The Court concurs that TMG owed a fiduciary duty to AWC.

What is disputed is whether any action taken by TMG violated its fiduciary duty to AWC.  The bulk of AWC's breach of fiduciary duty claim concerns TMG's allegedly "secret" Settlement Agreement with the Owner.  AWC accuses TMG of "[s]ecret self-dealing," of "surreptitiously settling" claims against the Owner, and of "wrongfully concealing" the Settlement Agreement from AWC.[146]  As AWC recognized in its briefing and at Oral Argument, AWC's breach of fiduciary duty claim as to TMG's Settlement Agreement seeks duplicative relief as its breach of contract claim grounded on the same allegations.[147]  Because the Court has found that AWC is entitled to summary judgment on its breach of contract claim, the Court denies the

---

[143] *Gerdes v. Estate of Cush*, 953 F.2d 201, 205 (5th Cir. 1992).

[144] *See* AWC's Statement of Undisputed Material Facts, R. Doc. 58-1 at ¶ 16 and TMG's Statement of Contested Material Facts, R. Doc. 63-1 at ¶ 16.

[145] *See White Haul Transp., Inc. v. Coastal Bridge Co.*, No. CIV.A. 06-11260, 2008 WL 2308858, at *4 (E.D. La. June 3, 2008) (Lemelle, J.) ("There is a fiduciary duty between members of a joint venture similar to that which exists between partners in a partnership." (citing *Moroux v. Toce*, 943 So. 2d 1263 (La. App. 3 Cir. 2006))); La. C.C. art. 2809 ("A partner owes a fiduciary duty to the partnership and to his partners.").  Louisiana law treats partnerships and joint ventures as nearly identical.  *See Latiolais v. BFI of Louisiana, Inc.*, 567 So. 2d 1159, 1161 (La. App. 3d Cir. 1990) ("[I]n general, joint ventures are governed by the law of partnership." (quoting *Cajun Electric Power Cooperative, Inc. v. McNamara*, 452 So. 2d 212, 215 (La. App. 1st Cir. 1984))).

[146] R. Doc. 58-2 at pp. 10–14.

[147] *See* R. Doc. 151 at p. 23.

Motion as to AWC's breach of fiduciary duty claim to the extent that it concerns the Settlement Agreement.

Insofar as AWC argues that TMG breached its fiduciary duty by failing to make working capital contributions which did not first receive unanimous Executive Committee approval and by failing to repay any purported Article 7(e) loans and accompanying interest to AWC, the Court finds that such claims have been mooted by the Court's prior Order and Reasons granting TMG's Motion for Partial Summary Judgment.[148]  For the reasons previously stated, the Court has dismissed any claims, whether rooted in breach of contract or breach of fiduciary duty, relating to TMG's alleged failure to repay any Article 7(e) loans or interest on those loans.[149]

That being said, the Court's previous Order did not affect any claims by AWC, whether for breach of contract or breach of fiduciary duty, regarding TMG's alleged failure to "act in good faith in its participation in the Executive Committee," "refusal to approve the Managing Party's (AWC's) necessary requests for contribution of working capital," and refusal "to fully attend and participate in Executive Committee Meetings."[150]  Such claims have not been dismissed by the Court.  In its Motion for Partial Summary Judgment, TMG sought the dismissal of "AWC's claims against TMG for the monies allegedly loaned to TMG by AWC for the capital contributions."[151]  The Court granted that relief, dismissing AWC's claims to recover for any loans made to TMG.  Although the Court's Order stated, as counsel for TMG

---

[148] R. Doc. 146.
[149] *Id.*
[150] R. Doc. 42 at ¶¶ 112, 123.
[151] R. Doc. 55 at p. 2.

noted during Oral Argument, that the Court granted "TMG's Motion for Partial Summary Judgment to the extent it seeks dismissal of any and all claims related to TMG's purported failure to make working capital contributions," in context, that statement pertained only to AWC's Article 7(e) claims as those claims were the subject of TMG's Motion.[152]

However, the Court finds that AWC's remaining capital contribution claims cannot be resolved by the Court at the summary judgment stage due to genuine disputes of material fact. Those allegations have not been fully developed and the underlying facts are disputed by the parties.[153] Summary judgment is therefore inappropriate at this point. The Court therefore denies AWC's Motion on this claim.

### iii.   Interest on Capital Contributions

Lastly, AWC seeks summary judgment on its claim for interest payments due by TMG from the capital contributions AWC provided to the Joint Venture in excess of its proportionate share.[154] Per the Agreement, TMG and AWC "shall" make certain capital contributions "when and as required for the performance of the Contract . . . in accordance with their Proportionate Shares."[155] "The need for working capital and

---

[152] *See* R. Doc. 55 ("[TMG] seeks dismissal of plaintiff Archer Western Contractors, LLC's (AWC) claims for amounts allegedly loaned to TMG for capital calls to which TMG never consented. . . . AWC's failure to obtain the requisite unanimous approval of the Executive Committee for the underlying capital calls to the Joint Venture is fatal to its attempt to recover such funds from TMG."); *see also* R. Doc. 146 at p. 22. In that Order and Reasons on TMG's Motion for Partial Summary Judgment, the Court recognized the relief sought by TMG—dismissal of any claims for monies allegedly lent by AWC to TMG through TMG's supposed breach of its obligations to make capital contributions—and granted that requested relief. *Id.* at pp. 21–22.

[153] For example, the parties continue to dispute the necessity of the working capital contributions, whether TMG participated in any Executive Committee meetings, and what communications occurred between the parties. *See* AWC's Statement of Undisputed Material Facts, R. Doc. 58-1 at ¶¶ 36–37 and TMG's Statement of Contested Material Facts, R. Doc. 63-1 at ¶¶ 36–37.

[154] R. Doc. 58-2 at pp. 14–17.

[155] R. Doc. 58-4 at p. 9 (Article 7(a)).

the dates on which it is to be furnished shall be determined by the Managing Party and upon unanimous approval of the Executive Committee, each such determination shall be binding and conclusive on the parties."[156]    Article 7(e) of the Agreement further provides:

> Should any party (the "Defaulting Party") be unable or fail or neglect to contribute its Proportionate Share of the working capital within 7 calendar days after the date set for the contribution thereof by the Managing Party, the other Party (the "Non-Defaulting Party") may, at their option, pay the share of the Defaulting Party (the "Defaulting Party's Contribution"). If the Non-Defaulting Party pays all or part of the Defaulting Party's Contribution, such payments shall be deemed to be demand loans made by the Non-Defaulting Party to the Defaulting Party. Such loans shall be immediately repayable by the Defaulting Party without notice and shall bear interest at a rate per annum equal to 3% above the Prime Lending Rate, determined on a day to day basis.[157]

In its prior Order and Reasons granting TMG's Motion for Partial Summary Judgment, the Court held that the plain language of the Agreement requires that the Executive Committee unanimously approve the Managing Party's determination of the need for working capital for the determination to bind the parties.[158]  The Court then explained that the lack of unanimous Executive Committee approval of the capital contributions in question meant that TMG did not default on any obligation by refusing to provide the requested working capital.[159]  There simply was no obligation to default on.  As the Court stated, "without any underlying obligation to

---

[156] *Id.*
[157] *Id.* (Article 7(e)).
[158] *See* R. Doc. 146.
[159] *See id.* at pp. 21–22.

make the working capital contributions, TMG cannot be said to have been in default such that the provisions of Article 7(e) apply."[160]  Despite AWC's payment of TMG's alleged "share" of the capital contributions, no Article 7(e) loans ever came into existence because TMG was never in default.  And because the loans never properly existed, it follows that the interest on said loans is likewise nonexistent.  Without an underlying default by TMG, AWC may not recover any interest payments under Article 7(e).  Moreover, AWC conceded at Oral Argument that this portion of its Motion has been mooted by the Court's prior Order.  The Court therefore denies AWC's Motion on this claim.

## IV.    CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED** that the Plaintiff's Motion for Partial Summary Judgment[161] is **GRANTED in part** and **DENIED in part**.  The Court grants the Motion as to AWC's breach of contract claim relating to TMG's Settlement Agreement.  The Court denies the Motion in all other respects.

**IT IS FURTHER ORDERED** that a Telephone Status Conference be held in this matter on Wednesday, June 12, 2024 at 10:00 a.m. to discuss next steps in this case and to select new trial and pretrial conference dates.  Dial-in information will be sent to counsel of record.

New Orleans, Louisiana, June 6, 2024.

*Wendy B. Vitter*

**WENDY B. VITTER**
**United States District Judge**

---

[160] *Id.* at p. 22.
[161] R. Doc. 58.